# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 12, 2011

## STATE OF TENNESSEE v. ANTHONY BOYLAND

**Appeal from the Criminal Court for Shelby County**
**No. 07-04685     Paula Skahan, Judge**

---

**No. W2010-00677-CCA-R3-CD  - Filed June 21, 2011**

---

A Shelby County Criminal Court jury convicted the defendant, Anthony Boyland, of first degree murder committed in the perpetration of an aggravated burglary, *see* T.C.A. § 39-13-202(a)(2)(2006); aggravated assault by the use of a deadly weapon, *see id*. § 39-13-102(a)(1)(B); and aggravated burglary, *see id*. § 39-14-403(a), and the trial court imposed an effective life sentence in the custody of the Department of Correction.  In addition to attacking the sufficiency of the evidence to support his convictions, the defendant contends that the trial court erred by (1) determining that he was competent to stand trial, (2) excluding evidence of a mental disease or defect that would have negated mens rea, (3) excluding evidence of a victim's pending criminal charges, (4) denying his special requests for jury instructions concerning imperfect self-defense and passion, and (5) instructing the jury concerning flight.  Discerning no error, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and ROBERT W. WEDEMEYER, J., joined.

Lauren Pasley-Ward, Memphis, Tennessee, for the appellant, Anthony Boyland.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; William L. Gibbons, District Attorney General; Steven Crossnoe and Cavett Ostner, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

On the morning of February 13, 2007, Starkeshia Swift, Curtis Bonds, Marcus Kuyendall, and Joesette Carter returned to Ms. Swift's apartment to find the defendant hiding in a bedroom closet. An argument concerning the defendant's unwelcome presence quickly evolved into a physical confrontation between the defendant and Mr. Bonds in the living room of the apartment. At one point, the defendant retreated to the bedroom, returned to the living room armed with a knife, and stabbed Mr. Bonds. The defendant continued his pursuit of Mr. Bonds outside the apartment as the others attempted to flee. The defendant, still armed with a knife, then turned to Ms. Swift and engaged her in a confrontation during which Ms. Swift suffered a severe cut to her thigh. The defendant eventually fled the area on foot. Ms. Swift and Ms. Carter found Mr. Bonds lying in the parking lot, bleeding severely from his wounds. Mr. Bonds died a short time later as the women waited for the police and ambulance to arrive. Ms. Swift was transported via ambulance to a local hospital where she received nine staples to treat the wound to her leg.

The defendant turned himself in to the police within hours of the incident. In his statement to the police, the defendant admitted hiding the knife in the mattress of a bed, but he claimed that he had acted in self-defense. The defendant received no bruises or abrasions of any kind from the incident.

Starkeshia Swift testified that she and the defendant had a child together, but they had broken up in 2006 when their son was two-years-old. Following their breakup, Ms. Swift did not maintain direct contact with the defendant and, in fact, had obtained a restraining order against him. She did, however, allow the defendant a relationship with his son through the assistance of the defendant's mother. Ms. Swift said that she never gave the defendant a key or invited him to her apartment. She said that the defendant was not welcome in her apartment. The defendant had never fought Messers Bonds or Kuyendall at any time before this date. She maintained that no one had initiated a fight with the defendant or prevented him from leaving the apartment on the day of the incident. Likewise, neither she nor her friends were armed at any time during the incident.

After visiting at her mother's home on the night of February 12, Ms. Swift and her friends returned to her apartment. As they walked down the hallway to her bedroom, Mr. Bonds entered the room first and opened the closet door to discover the defendant inside. When Ms. Swift saw the defendant leaving the closet, she immediately returned to the living room where she could telephone the police "[b]ecause [the defendant] wasn't supposed to be in [her] house." As Ms. Swift spoke to the 9-1-1 operator, she turned to see the defendant and Mr. Bonds fighting. Initially, neither the defendant nor Mr. Bonds had any weapons. The defendant, however, retreated to the bedroom and soon returned to the living room

armed with a knife. The defendant pushed Mr. Bonds into a china cabinet and "stuck" him.

Ms. Swift , who was "in shock" when she saw the defendant stab Mr. Bonds, quickly ran to the door and unlocked the deadbolt so that they could all escape. She recalled that Mr. Bonds ran out, followed by Mr. Kuyendall and Ms. Carter. Ms. Swift tried to run out onto the threshold stair landing, but the defendant "came after" her and "stuck" her in the leg. Mr. Bonds, who saw the defendant fighting Ms. Swift, yelled for the defendant to stop. The defendant then ran to Mr. Bonds and fled the apartment complex parking lot on foot. Ms. Swift and Ms. Carter drove to the entrance of the apartment complex to find Mr. Bonds lying in the street in a pool of blood. A neighbor gave Ms. Carter a towel, and she attempted to apply pressure to Mr. Bond's wound to stop the bleeding. He died before the ambulance arrived.

Joesette Carter testified consistently with Ms. Swift's account of the incident. She also recalled that she went to the kitchen when they first arrived at the apartment. She said that she had given Ms. Swift a knife set and that when she looked in the kitchen drawer that morning, "every last one" of the knives was gone. When she heard the defendant and Mr. Bonds arguing in the hallway, she just "froze up." Ms. Carter recalled that the argument escalated into a fight within a minute. She heard the defendant say to Mr. Bonds, "[B]itch, you want to f*** with me." Soon thereafter, she heard the defendant stab Mr. Bonds. She said that "everything happened fast."

On February 13, 2007, Memphis Police Department (MPD) Officer Victor Lester responded to a call at the Ridgecrest Apartments concerning a "boyfriend who refused to leave" the caller's apartment. When Officer Lester arrived, he found Mr. Bonds lying in the street in a puddle of blood while Ms. Carter and Ms. Swift attempted to control the bleeding with a towel. Officer Lester recalled that Mr. Bonds "didn't appear to be breathing and his eyes had turned in his head." He said that "when [Ms. Carter] removed the towel[, Mr. Bonds] was out of blood." An ambulance soon arrived and attempted to resuscitate Mr. Bonds without success.

Both Ms. Carter and Ms. Swift told Officer Lester that the defendant had stabbed Mr. Bonds.[1] Officer Lester issued a "BOLO" (be on the lookout alert) containing the defendant's description and information that he was armed with a knife. Approximately two hours later, the defendant's "auntie" telephoned the police and told them that the defendant wanted to turn himself in. The defendant was arrested without incident that

---

[1] Sergeant David Parks testified that Mr. Kuyendall fled the scene and was never located for questioning because, Sergeant Parks learned, Mr. Kuyendall had outstanding warrants against him at the time of the incident as well as at the time of trial.

afternoon. He told officers that he had disposed of the knife near the apartment complex. When officers searched the area, however, they did not recover the knife. Officer Lester recalled that the defendant was calm and did not have any physical indicia of having been in a fight earlier that day.

MPD Officer Darron Smith arrived at the apartment complex a short time after Officer Lester. He recalled that Mr. Bonds was "lying in the parking lot" and "was pretty much deceased" at the time he arrived. Officer Smith assisted in the defendant's arrest later that afternoon. He described the defendant as "slightly nervous" yet "rather polite." He said that the defendant was "very cooperative and gave us no problem."

MPD Sergeant Anthony Mullins, a member of the homicide bureau, arrived at the apartment complex after Mr. Bonds and Ms. Swift were transported to the hospital. He secured the scene and evidence and then went to the hospital to collect evidence from Mr. Bonds. He recalled collecting Mr. Bonds's clothing and said that it was "so bloody" that it had to be taken to a special facility to be dried.

Sergeant Mullins assisted in questioning the defendant later that day. He recalled the circumstances of the defendant's execution of his waiver of rights and that the defendant had some difficulty reading the form. Sergeant Mullins said, however, that the defendant indicated his understanding of each right by initialing each prior to signing the waiver. The defendant appeared calm with a "very even temperament" throughout the interrogation. Sergeant Mullins said that his previous assignment as a crisis officer had given him experience with individuals suffering from chemical dependency or mental health issues and that the defendant exhibited no signs of distress or lack of understanding. He testified that he would have stopped an interrogation if he suspected a defendant had "mental issues, learning disabilities, [or] . . . [was] not really understanding." The defendant gave a statement which was transcribed. Following the interrogation, the officers read the statement to the defendant. The defendant signed the statement, acknowledging it as his account of the incident.

MPD Sergeant David Parks acted as case coordinator over the investigation of the incident. As case coordinator, he assigned officers various tasks, including canvassing areas where the defendant might be in an effort to locate him for questioning. To this end, the officers spoke with several of the defendant's family members in the hours following the incident. Sergeant Parks said that the defendant turned himself in and was brought to the police station later that afternoon. He described the defendant as "calm under the circumstances. It was obvious he realized what he had done[,] but he was calm."

Sergeant Parks said that the defendant signed a waiver of his rights after being

-4-

provided *Miranda* warnings and confessed to stabbing Mr. Bonds and Ms. Swift. The defendant told Sergeants Parks and Mullins that Ms. Swift asked him to come to her apartment to clean it. He arrived on the afternoon of February 12 and stayed overnight while Ms. Swift and the others were gone. The defendant said that when the group discovered him at the apartment the next morning, Mr. Bonds told the defendant that he was not supposed to be there. The defendant said that he thought Mr. Bonds was walking away when suddenly Mr. Bonds hit him. The two began to fight. The defendant ran to the bedroom to get the knife that, he explained, he had put under the mattress the night before "in case [Ms. Swift] came back with anybody . . . being safe." The defendant then "stuck" Mr. Bonds with the knife. The defendant said that Ms. Swift attempted to stop him from leaving the apartment, so he swung the knife and cut her leg. In summary, the defendant claimed that he "was just defending himself."

Sergeant Parks testified that the defendant could have stopped the interrogation at any time but did not do so. Furthermore, he could have "walked away" from the statement, but he initialed each page and signed it instead. Sergeant Parks said that the defendant had a basic understanding of "what was going on" during the interrogation. Lieutenant Walter Davidson read the statement to the defendant because the defendant told the officers that he could not read well. Lieutenant Davidson recalled that the defendant understood "everything."

Doctor Lisa Funte, a forensic pathologist with the Shelby County Regional Forensic Center, performed the autopsy of Mr. Bonds. She determined that Mr. Bonds died from a stab wound to his right shoulder that penetrated into his chest cavity, through his lung and near his heart. Additionally, Mr. Bonds suffered a perforating wound to his right arm and several abrasions. Although Mr. Bonds's toxicology report revealed the presence of marijuana, Doctor Funte testified that the amount was "barely above the detectable level" and would not "have [had] much effect on [Mr. Bonds] at all."

The State rested its case. Following a proper colloquy concerning his right to testify, the defendant chose not to testify. *See Momon v. State,* 18 S.W.3d 152 (Tenn. 1999).

Barbara Faulkner, manager of the Ridgecrest Apartments, testified that Ms. Swift's tenant file showed that Ms. Swift requested both mailbox keys and apartment keys on five separate occasions in 2007. She further testified, however, that the first request was made in May 2007, almost three months after the stabbing.[2] The defendant recalled as a

---

[2] The State objected to Ms. Faulkner's testimony on the grounds of relevancy and asked that it be stricken. The defendant argued that the testimony was relevant to rebut Ms. Swift's claim that she never

(continued...)

witness Ms. Swift who testified that the defendant did not have a key to her apartment. She admitted, however, that she had lost a key and asked for a replacement sometime in 2007.

Cleetris Boyland, the defendant's mother, testified that the defendant was "very slow" and could not comprehend things well. She said that he was diagnosed with mild mental retardation at the age of three. The defendant graduated at the age of 18 with a special education diploma and maintained employment as a grocery sacker for a period of time after graduation. When she learned from her sister that the defendant had been involved in a fight and that the police were looking for him, she went to her sister's home where the defendant later turned himself in to the police. She recalled that the officers "put [the defendant] in the car and told [her] that [she] didn't have to worry about him, he'd be okay." No one asked Ms. Boyland anything concerning the defendant's intellectual ability.

Doctor Joseph Charles Angellilo, a forensic psychologist, testified that the defendant's educational records revealed an intelligence quotient (IQ) of 56 at age 10. Testing performed by Doctor Angellilo when the defendant was 25 years old revealed an IQ of 53. Doctor Angellilo opined that the defendant's immediate memory was "not so great." On cross-examination, he admitted that the defendant's concealing the knife in the mattress showed a higher level of cognition and required some planning.

Based upon this evidence, the jury convicted the defendant of the first degree felony murder of Mr. Bonds, the aggravated assault of Ms. Swift, and aggravated burglary. At sentencing, the trial court imposed concurrent sentences of life, three years, and three years, respectively, for a total effective sentence of life imprisonment. The defendant filed a timely motion for new trial, which was overruled by the trial court. A timely notice of appeal followed. This appeal is properly perfected to this court.

*Competency to Stand Trial*

Initially, the defendant argues that the trial court erred by determining him competent to stand trial despite the undisputed evidence of the defendant's mild mental retardation.[3] The State contends that the trial court correctly determined that the defendant

---

[2](...continued)
gave extra keys to her apartment to anyone. The court expressed concern over the relevancy of the evidence because it related to occurrences after the stabbing. The court overruled the State's objection nevertheless.

[3] We note that Tennessee Code Annotated section 39-13-203 was recently amended by changing all references from "mental retardation" to "intellectual disability." *See* T.C.A. § 39-13-203 (2010). As noted by our supreme court, the term "intellectual disability" is now preferred over "mental retardation."
(continued...)

understood the nature of the proceedings and could assist counsel in his defense, despite the proof concerning the defendant's mild mental retardation.

"The Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution prohibit a mentally incompetent person from being put to trial." *State v. Reid*, 213 S.W.3d 792, 808 (Tenn. 2006) (citing *Pate v. Robinson,* 383 U.S. 375, 378 (1966); *State v. Blackstock*, 19 S.W.3d 200, 205 (Tenn. 2000)). The assessment of competency is multi-pronged. To be deemed competent, a defendant must have "'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.'" *State v. Black*, 815 S.W.2d 166, 174 (Tenn. 1991) (quoting *Mackey v. State*, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975)). The defendant bears the burden of establishing his incompetence by a preponderance of the evidence in the trial court. *State v. Reid*, 164 S.W.3d 286, 306-08 (Tenn. 2005). The trial court's findings "are conclusive on appeal unless the evidence preponderates otherwise." *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

At the pretrial competency hearing, Ms. Boyland testified in depth concerning the defendant's delayed intellectual development. She said that she first noticed he was not progressing as other children when the defendant was approximately two years old and could not talk. At age three, the defendant attended a Head Start Program where he was referred for evaluation for a suspected learning disability. Ms. Boyland said that the defendant could not do anything that other children his age could do at age five. The defendant received an evaluation through the social security administration which resulted in a diagnosis of mild mental retardation. He received special education services throughout his scholastic career. By fourth grade, the defendant had developed "some self-help and survival skills" but was still "very slow." He graduated with a special education diploma at age 18.

Doctor Angellilo also testified at the competency hearing. He noted that during his initial interview with the defendant they had some difficulty understanding each other. He recalled that the defendant "could understand [some things] that were relatively simple" but could not understand other things. Doctor Angellilo testified that the defendant's first IQ test revealed a score of 72 but that recent testing at age 25 revealed a score of 53. Doctor Angellilo explained that the "drop" in the defendant's IQ score occurred because "people in [the defendant's age] group are advancing more than he is" at this time of his life. Doctor

---

[3](...continued)

*Michael Angelo Coleman v. State*, ___ S.W.3d ___, No. W2007-02767-SC-R11-PD, slip op. at 5 n.5 (Tenn. Apr. 11, 2011). At the time of the defendant's competency hearing, however, the term "mental retardation" was of common use still. As such, we will refer to the defendant's mental defect in the terms employed by the witnesses, parties, and the trial court in this case.

Angellilo detected no signs that the defendant was malingering in his responses to the assessment questions.

Concerning the defendant's competency to stand trial, Doctor Angellilo said that the defendant possessed a "basic factual understanding" of the criminal process. He, however, opined that the defendant lacked a "good" understanding of his *Miranda* rights.[4] Doctor Angellilo then opined that the defendant was "competent to stand trial . . . if the criteria . . . has to do with factual understanding [and] an ability to communicate his understanding of the behaviors that went into the situation that led to his being charged" but added that he believed that the defendant would testify "poorly" because of his "very poor ability to converse."

Doctor William Fulliton, Ph.D., a clinical psychologist, testified on behalf of the State. He concurred in the diagnosis of mild mental retardation consistent throughout the defendant's life. He described the defendant's thinking as "simple but clear." His evaluation revealed that the defendant understood the roles of courtroom participants, could identify certain witnesses in the case and discuss what they might testify to at trial, and could calculate the length of his possible sentences. Doctor Fulliton opined that the defendant was "able to participate meaningfully in his defense" as evidenced by his understanding that killing is wrong and his claim that he acted in self-defense. In summary, Doctor Fulliton testified that the defendant possessed "an ability to explain what happened and he did [explain] it very clearly." He concluded that the defendant was "adequately communicative" and had the "capacity to make decisions in his best interest regarding his case."

Based upon this evidence, the trial court found that the defendant "underst[ood] the nature of the proceedings" and "ha[d] the ability to consult with counsel." Accordingly, the trial court ruled the defendant competent to stand trial. We conclude that the evidence does not preponderate against these findings and affirm the trial court's ruling concerning the defendant's competency to stand trial.

*Sufficiency of the Evidence*

The defendant also contends that the evidence is insufficient to support his convictions. He concedes that he was present in the apartment but argues that he was invited and acted in self-defense based upon inconsistencies in witness testimony. The State

_____

[4] We note that the defendant did not file any motion to suppress his statement to the police alleging that his mental retardation precluded him from knowingly waiving his rights. The trial court, however, allowed some evidence at trial concerning the defendant's basic understanding of and ability to waive these rights.

contends that evidence clearly showed that the defendant entered the residence without permission and with the intent to commit an assault, stabbed Mr. Bonds as Mr. Bonds attempted to flee the apartment, and then assaulted Ms. Swift.

We review the defendant's claim attacking the sufficiency of the evidence to support his convictions mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

Tennessee Code Annotated defines first degree murder, as is applicable in this case, as "[a] killing of another committed in the perpetration or attempt to perpetrate any . . . burlgary." T.C.A. § 39-13-202(a)(2).

The Code also provides, as is applicable in this case, that "[a] person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault . . . and . . . [u]ses or displays a deadly weapon." *Id*. § 39-13-102(a)(1)(B). An assault is defined in our Code as "[i]ntentionally, knowingly, or recklessly caus[ing] bodily injury to another." *Id*. § 39-13-102(a)(1).

"Aggravated burglary is burglary of a habitation as defined in §§ 39-14-401 and 39-14-402." *Id*. § 39-13-403(a). Burglary, as is applicable in this case, is committed when a person "without the effective consent of the property owner . . . [e]nters a building . . . with the intent to commit an assault." *Id*. § 39-14-402(a)(1).

The evidence in this case revealed that the defendant entered Ms. Swift's apartment without her consent, concealed a knife between the mattresses of her bed, and waited overnight in the bedroom closet for Ms. Swift's return. When discovered in the closet

the next morning, the defendant began arguing with Mr. Bonds. The argument quickly escalated into a fight. Next, the defendant verbally threatened Mr. Bonds' safety, retrieved the knife from the bedroom, and mortally stabbed Mr. Bonds as he attempted to flee from the apartment. Initially pursuing Mr. Bonds, the defendant returned to assault Ms. Swift with the knife, an obviously deadly weapon. She required nine staples to treat her wound. Accordingly, we conclude that the evidence is sufficient to support the defendant's convictions in this case.

### *Exclusion of Evidence to Negate Mens Rea*

The defendant argues that the trial court erroneously excluded "diminished capacity" evidence. The State asserts that the trial court properly excluded evidence proffered by the defendant to negate mens rea because the mental states relevant to this case would not be negated by such proof and because "nothing presented to the trial court showed that the defendant was incapable of the intent to commit the crimes of which he was charged and ultimately convicted."

In *State v. Phipps*, 883 S.W.2d 138 (Tenn. Crim. App. 1994), this court permitted the introduction of evidence regarding the defendant's mental condition for the purposes of negating the requisite mental state for the offense charged. *Phipps,* 883 S.W.2d at 149. As our supreme court said in *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997), the use of such evidence is not a defense to a crime, but it is "'merely a rule of evidence'" allowing proof of the defendant's mental condition to negate the requisite culpable mental state. *Hall*, 958 S.W.2d at 688-89 (quoting *United States v. Pohlot*, 827 F.2d 889, 897 (3rd Cir. 1987)); *see also Phipps*, 883 S.W.2d at 143. As reiterated by our supreme court in *State v. Faulkner*, 154 S.W.3d 48 (Tenn. 2005), "'psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law.'" *Faulkner*, 154 S.W.3d at 56-57 (quoting *Hall*, 958 S.W.2d at 689-90).

We conclude that the trial court correctly ruled the evidence inadmissible because Doctor Angellilo's report did not include a finding that the defendant lacked the capacity to form the intent to commit the crimes due to a mental disease or defect. *See Hall*, 958 S.W.2d at 690 (holding that proffered evidence was properly excluded where expert failed to make finding that defendant lacked capacity to form requisite intent due to a mental disease or defect). Accordingly, we conclude that the trial court did not err in excluding the evidence of the defendant's mental retardation offered purportedly to negate mens rea.

*Exclusion of Evidence of Ms. Swift's Pending Criminal Charges*

Next, the defendant argues that the trial court erroneously excluded evidence of Ms. Swift's pending criminal charges of aggravated assault as evidence of bias. The State asserts that the trial court properly excluded the evidence of the pending criminal charges because the evidence was not relevant to bias.

The record reflects that the defendant first sought to question Ms. Swift regarding charges pending against her for aggravated assault in order to elicit evidence that Ms. Swift was the first aggressor in this case. The State objected and sought exclusion of the evidence because the incident leading to Ms. Swift's arrest occurred after the February 2007 stabbing incident, did not involve the defendant in any way, and could not have been relevant to his state of mind at the time of the stabbings as it pertained to his claim of self-defense. The trial court sustained the State's objection on relevancy grounds.

On the following morning and while Ms. Swift's cross-examination was still ongoing, the defendant again sought to elicit proof concerning the pending criminal charges, but this time the defendant argued that the charges were relevant to any bias Ms. Swift may have had in testifying against the defendant. During this questioning, Ms. Swift admitted that she had charges of aggravated assault pending in another division of Shelby County Criminal Court. During the ensuing bench conference, the defendant's argument evolved into an inartful reference to the existence of any promises of leniency Ms. Swift may have received in exchange for her testimony. The State asserted that no promises were made and argued that the defendant did not have a good faith basis for asking such a question. The trial court agreed and sustained the State's objection.

To be sure, the propriety, scope, manner, and control of cross-examination rests within the sound discretion of the trial court. *See State v. Hutchison*, 898 S.W.2d 161, 172 (Tenn. 1994); *State v. Barnard*, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994). Absent a clear abuse of this discretion that results in manifest prejudice to the accused, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984). In addition, "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Tenn. R. Evid. 611(b). If a witness has received or been promised government-supplied benefits or some favorable consideration in exchange for testifying against a defendant, that information is exculpatory in its tendency to impeach the witness' credibility and motive for testifying. *United States v. Giglio*, 405 U.S. 150, 154-55 (1972); *Hartman v. State*, 896 S.W.2d 94, 101 (Tenn. 1995).

We agree that any evidence showing that Ms. Swift received favorable

treatment concerning her pending criminal charges in exchange for her testimony at trial would have been relevant to impeach her credibility. *See State v. Rice*, 184 S.W.3d 646, 670 (Tenn. 2006) (citing *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001). Moreover, although acts of violence not known to a defendant cannot be relevant as substantive evidence to show the defendant's state of mind, *see State v. West*, 825 S.W.2d 695, 697 (Tenn. Crim. App. 1992), evidence of a victim's specific act of violence may be relevant to corroborate a defendant's claim of self-defense even when the defendant does not have knowledge of the act, *see State v. Ruane*, 912 S.W.2d 779, 782 (Tenn. Crim. App. 1995).

That being said, we discern no reversible error in the trial court's limitation of cross-examination in this case. At each failed attempt to elicit information concerning the pending charges, the defendant's argument evolved. The substance of the information sought by the defendant likewise changed through each attempt. The defendant initially sought information concerning the underlying facts of the offense (that Ms. Swift may have stabbed some third person) in order to show evidence that Ms. Swift may have been the first aggressor, but the defendant ultimately sought information concerning "bias" against the defendant as may be evidenced by the pending charges. To this argument, the prosecutor asserted to the trial court that no promises of leniency were made to Ms. Swift in exchange for her testimony and that the defendant did not have a good faith basis to ask questions concerning promises of leniency. We doubt that the defendant needed a good faith basis for asking such questions, but any error in the trial court's ruling would clearly be harmless. *See* Tenn. R. App. P. 36(b).

*Jury Instruction Issues*

Finally, the defendant makes several attacks on the propriety of the trial court's instructions to the jury in this case. He contends that the trial court erred by denying his special requests concerning imperfect self-defense and passion. He also contends that the trial court erroneously instructed the jury concerning flight. The State argues that the jury instructions were correct in all instances.

In criminal cases, a defendant has the right to a correct and complete charge of the law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). Thus, it follows that the trial court has a duty to give a complete charge of the law applicable to the facts of a case. *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). The failure to do so deprives the defendant of the constitutional right to a jury trial. *Garrison*, 40 S.W.3d at 432. In evaluating claims of error in the jury charge, this court must review the charge in its entirety and read it as a whole. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). A jury instruction is considered "prejudicially erroneous if it fails to fairly submit the legal issues or if it

misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). Notably, when jury instructions fully and fairly state the applicable law, a trial court is not required to provide special instructions. *State v. Mann*, 959 S.W.2d 503, 521 (Tenn. 1997); *State v. Kelley*, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984).

*A. Imperfect Self-Defense*

The defendant filed a special request for a jury instruction concerning "imperfect self-defense," as defined in California Criminal Jury Instructions No. 571, as follows:

> A killing that would otherwise be murder may be reduced to voluntary manslaughter if a defendant killed a person because he acted in imperfect self-defense.
>
> If from all the facts and circumstances you find the defendant acted in complete self-defense, or if you have a reasonable doubt as to whether the defendant acted in complete self-defense, you must find him not guilty. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable.
>
> A defendant acts in imperfect self-defense if:
> 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury;
> AND
> 2. The defendant actually believed that the immediate use of deadly force was necessary to defend himself against the danger;
> BUT
> 3. At least one of those beliefs was unreasonable.
>
> Imperfect self-defense is not a complete defense to homicide, but may be considered in evaluating whether the homicide was murder or voluntary manslaughter.

During the jury instruction conference, the defendant argued the aptness of this special request in light of the evidence of the defendant's mental retardation. The State objected to its inclusion in the jury charge because it was misleading and confusing, particularly when compared to the pattern instruction on self-defense. The trial court denied the special request

-13-

based upon its finding that imperfect self-defense is "not the law in Tennessee."

In our view, the requested instruction is not an accurate statement of the law. Furthermore, the record reveals that the trial court instructed the jury regarding self-defense as well as voluntary manslaughter. These instructions accurately stated the law, negating any basis for the special request. Moreover, the requested instruction would have served only to confuse or mislead the jury. For these reasons, we conclude that the trial court correctly denied the defendant's special request.

*B. Passion*

The defendant also filed a special request defining passion, as it relates to voluntary manslaughter, as "an emotional state, which includes fear, terror, excitement or nervousness." As with the special request concerning imperfect self-defense, the trial court considered the instruction, ruled that it was not a correct statement of the law, and denied the defendant's special request.

The record reflects that the trial court defined passion as it related to voluntary manslaughter consistently with the definition provided by our Code. *See* T.C.A. § 39-13-211 (stating "state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner"). We note, however, that caselaw in Tennessee that was decided prior to the modern revisions of the criminal code indicates that passion refers to "'any of the human emotions known as anger, rage, sudden resentment or terror which renders the mind incapable of cool reflection.'" *State v. Bullington*, 532 S.W.2d 556, 559 (Tenn. 1976) (discussing the role of "passion" in negating the then required first degree murder element of deliberation) (quoting *Drye v. State*, 184 S.W.2d 10 (1944)). We need not parse, however, whether the proposed instruction that exemplified "passion" by using the term "fear, terror, excitement or nervousness" accurately stated current Tennessee law. Even without the requested instruction – and in light of the other instructions imparted by the trial court, we doubt that the trial court failed to fully and fairly state the applicable law. In any event, we are confident that any error in this regard is harmless. *See* Tenn. R. App. P. 36(b).

*C. Flight*

The defendant challenges the trial court's inclusion of an instruction on the defendant's flight because the defendant ultimately turned himself in within hours of the offenses. The State argues that the instruction was appropriate because it was raised by the evidence based upon the defendant's leaving the scene and disposing of the knife.

To be sure, there must be sufficient evidence of flight to support such

-14-

instruction and properly charge flight as an inference of guilt. *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence supporting such instruction requires "'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community.'" *State v. Payton*, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989) (quoting *Rogers v. State*, 455 S.W.2d 182, 187 (Tenn. Crim. App. 1970) (citing 22A C.J.S. Criminal Law § 625))). Our supreme court has held that "[a] flight instruction is not prohibited when there are multiple motives for flight" and that "[a] defendant's specific intent for fleeing a scene is a jury question." *Berry*, 141 S.W.3d at 589.

We recognize the defendant's concern that a flight instruction was given despite the defendant's ultimate cooperation with the police by turning himself in and the arguable fact that he never "concealed" himself. However, the record clearly establishes that the defendant left the scene of the crime, disposed of the knife in his escape, and remained undetected for several hours after the crimes and while the police steadfastly searched for him. In our view, this behavior satisfies the requirements of "leaving, evading, and concealing." The trial court's instruction on flight was apt under these circumstances.

*Conclusion*

Having determined neither paucity of evidence nor any trial court error, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE